IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cathy Yvonne Jones, | ) | C/A No.: 1:15-1650-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

    A.    Procedural History

On October 16, 2012, Plaintiff protectively filed an application for DIB in which she alleged her disability began on June 1, 2009. Tr. at 109, 221–22. Her application was denied initially and upon reconsideration. Tr. at 176–79, 181–82. On December 11, 2013,

Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 31–66 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 13, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 147–69. On February 18, 2014, the Appeals Council issued an order remanding the case to the ALJ. Tr. at 170–74. A second hearing was held on October 14, 2014. Tr. at 67–97 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 2, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 16, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 55 years old at the time of the second hearing. Tr. at 71. The ALJ found that Plaintiff had no past relevant work ("PRW"). Tr. at  24. Plaintiff alleges she has been unable to work since April 29, 2014.[1] Tr. at 71.

2.    Medical History

Plaintiff presented to Greenville Free Medical Clinic on December 14, 2010, complaining of pain in her right foot that radiated to her knee. Tr. at 331. The provider

---

[1] Prior to the second hearing, Plaintiff moved to amend her alleged disability onset date to April 29, 2014, to coincide with her fifty-fifth birthday. Tr. at 71, 256.

assessed plantar fasciitis, a right heel spur, depression, and anxiety and referred Plaintiff to a podiatrist. *Id.*

Plaintiff was admitted to Greenville Memorial Medical Center for involuntary emergency hospitalization for mental illness on October 31, 2011, after she attempted suicide by cutting her wrists. Tr. at 332. She indicated she was upset because her son informed her that she could no longer see her grandchildren. Tr. at 340. Plaintiff stated she felt worthless and useless and had been crying a lot over the prior three-month period. Tr. at 353. She reported a history of depression, but stated she had not been on medications for depression since 2006. *Id.* Plaintiff was transferred to Marshall I. Pickens Hospital on November 3, 2011, and remained hospitalized until November 17, 2011. Tr. at 370–71. Psychiatrist Millard C. Trott, M.D. ("Dr. Trott"), assessed principal diagnoses of bipolar I disorder, depressed, without psychotic features; benzodiazepine dependence (in partial remission for 11 years); alcohol abuse; family relational problem; and post-traumatic stress disorder ("PTSD"). Tr. at 374. He instructed Plaintiff to follow up with the Greenville Mental Health Center and to obtain prescription refills from either the Greenville Free Clinic or New Horizons. *Id.* Dr. Trott discharged Plaintiff with prescriptions for Remeron, Lithium, Toprol XL, Norvasc, Amiloride, Trazodone, Ativan, Phenergan, and Ultram. Tr. at 382.

Plaintiff presented to Greer Mental Health Center for an initial clinical evaluation on December 17, 2011. Tr. at 398–402. She indicated she needed help with depression, anxiety, and bipolar disorder and stated she was experiencing shortness of breath. Tr. at 398. She indicated she did not want to leave her house and often vomited and cried when

she had to leave. *Id.* She stated her weight gain had contributed to her depression. *Id.* Plaintiff denied suicidal and homicidal ideation, self-mutilation, and other risk-taking behavior. *Id.* Judith A. Goodwin, M.A. ("Ms. Goodwin"), assessed bipolar affective disorder. Tr. at 402. Plaintiff followed up with Paul P. Lowe, M.D. ("Dr. Lowe"), on January 17, 2012. Tr. at 408–10. She reported she had been unable to fill all of the prescriptions and was sleeping for three to four hours per night. Tr. at 408. A mental status examination was normal, except that Dr. Lowe indicated Plaintiff's mood was irritable and that she had poor insight as to the impact of substance abuse. Tr. at 409. Plaintiff failed to report for mental health visits on April 4, 2012, and June 4, 2012. Tr. at 405–06. Ms. Goodwin noted that Plaintiff had only been prescribed enough medication to last until February 2012. Tr. at 406. On September 9, 2012, Ms. Goodwin indicated no services were provided during the treatment period and that she would close Plaintiff's case. Tr. at 407. Plaintiff was discharged from services at Greer Mental Health Center on December 9, 2012. Tr. at 411.

On January 8, 2013, Plaintiff presented to Lary R. Korn, D.O. ("Dr. Korn"), for a consultative medical examination. Tr. at 418–21. She complained of chronic pain in her hip and knee joints, shortness of breath, and mental health issues. Tr. at 418. Dr. Korn indicated the examination of Plaintiff's hips and ankles was benign. Tr. at 420. He indicated Plaintiff had substantial patellofemoral crepitus bilaterally, but that McMurray's maneuver was otherwise negative. *Id.* He noted that Plaintiff could only crouch to 30 to 40 degrees before her patellofemoral joints prevented her from crouching any further. *Id.* Plaintiff demonstrated normal range of motion ("ROM") in her ankles

and hips. *Id.* She also had normal strength in her extremities and normal ROM in her spine. *Id.* Dr. Korn noted that Plaintiff had difficulty tandem walking, which appeared to result from the thickness of her lower extremities. *Id.* He observed no notable areas of muscle weakness or sensory loss. *Id.* He diagnosed moderate chondromalacia of the bilateral knees; dyspnea, status post partial laryngectomy for carcinoma; morbid obesity; and significant mental health issues and history. *Id.* Dr. Korn indicated pulmonary function testing and x-rays of Plaintiff's knees would be helpful. Tr. at 421. He stated it did not appear that Plaintiff would be able to crouch or squat, use proper technique when lifting from floor level, or walk for a significant duration or distance. *Id.* He indicated Plaintiff would have markedly limited ability to walk inclines or climb stairs due to the combined limitations caused by her dyspnea and patellofemoral joints. *Id.*

Plaintiff presented to psychologist Bruce A. Kofoed, Ph. D. ("Dr. Kofoed"), for a psychological evaluation on January 16, 2013. Tr. at 422–27. She reported a history of depression, bipolar disorder, and PTSD. Tr. at 423. Plaintiff indicated her PTSD diagnosis resulted from learning that her father molested her daughter from the ages of two to twelve. *Id.* She stated she had not attended any mental health treatment visits in several months and had discontinued use of prescribed medications because she did not like their side effects. Tr. at 424. Plaintiff indicated she had consumed no alcohol since October 2011. *Id.* She admitted to occasional use of marijuana and stated she last used it approximately three months earlier. *Id.* Plaintiff indicated she occasionally attended church or dined in restaurants with a friend, but stated she generally felt uncomfortable around people. Tr. at 425. Dr. Kofoed noted that Plaintiff cried frequently during the

interview and that her mood was depressed. *Id.* He indicated Plaintiff was generally pleasant, but sad during the interview. *Id.* Plaintiff reported fair appetite and a gain of approximately 60 pounds over the last couple of years. *Id.* She complained of poor sleep and stated she typically slept for three to four hours per night and sometimes went three or four days in a row without sleeping. *Id.* Dr. Kofoed indicated Plaintiff had intact arithmetic skills and fair to good recall for verbal and nonverbal information. *Id.* His diagnostic impressions were bipolar disorder, depressed without psychotic features; consider panic disorder, not otherwise specified; consider possible PTSD versus generalized anxiety disorder; and a history of alcohol and prescription medication misuse. Tr. at 426. He indicated Plaintiff appeared to be capable of making financial decisions in her own best interest. Tr. at 427.

On February 15, 2013, an x-ray of Plaintiff's left knee showed no acute or chronic bone or joint abnormalities. Tr. at 428. An x-ray of Plaintiff's chest was normal, as well. Tr. at 429.

On February 25, 2013, state agency medical consultant Carl Anderson, M.D., reviewed the medical evidence and completed a physical residual functional capacity ("RFC") assessment. Tr. at 118–20. He found that Plaintiff was limited as follows: occasionally lifting and/or carrying 50 pounds; frequently lifting and/or carrying 25 pounds; standing and/or walking for a total of about six hours in an eight-hour workday; sitting for a total of about six hours in an eight-hour workday; frequently climbing ramps and stairs, balancing, and stooping; occasionally kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards

(machinery, heights, etc.), fumes, odors, dusts, gases, poor ventilation, etc. *Id.* State agency medical consultant Dale Van Slooten, M.D., assessed the same restrictions in an RFC assessment dated April 29, 2013. Tr. at 138–40.

Plaintiff presented to David Price, Ph. D. ("Dr. Price"), for a mental status examination on May 21, 2013. Tr. at 435–39. Dr. Price observed Plaintiff to be tearful during the interview. Tr. at 435. He indicated Plaintiff was anxious and mildly depressed; had a negative and restricted range of affect; demonstrated variable attention and concentration; was a little agitated at times; and endorsed, but did not demonstrate flight of ideas and pressured speech. *Id.* He stated Plaintiff was cooperative and compliant; had satisfactory eye contact; had linear thought processes; was oriented to person, place, date, and situation; recalled four out of five words immediately and three words after a five-minute delay; completed serial sevens with two errors; could spell "world" correctly forwards and in reverse; recalled five digits forward and three digits backwards; and was able to abstract and interpret proverbs. Tr. at 435–36. He described Plaintiff's social judgment as impulsive. Tr. at 436. He indicated she could follow directions and relate to others, but could not handle her own funds. *Id.* Dr. Price's diagnostic impressions included moderate bipolar I disorder and rule out PTSD. Tr. at 439. He indicated Plaintiff would have difficulty interacting with the general public, but may be able to perform some type of substantial gainful activity. *Id.* He noted Plaintiff appeared to have mood swings and could have significant problems during manic phases. *Id.* He stated Plaintiff may not be able to manage her own funds during manic episodes. *Id.*

Plaintiff returned to Greer Mental Health Center for an initial clinical assessment on July 8, 2013. Tr. at 439–44. Adrienne T. McGregor, MSW ("Ms. McGregor"), observed that Plaintiff cried immediately and stated she felt anxious. Tr. at 439. Plaintiff indicated that the medications Dr. Lowe prescribed had made her feel like a zombie and unable to function. *Id.* She stated she was experiencing "bad thoughts" again. *Id.* She endorsed symptoms that included depressed mood, crying and tearfulness, feelings of worthlessness, low energy, difficulty sleeping, ongoing anxiety, and daily panic attacks. *Id.* Plaintiff demonstrated a neat appearance, appropriate motor activity, a cooperative attitude, and normal thought process. Tr. at 442–43. Her affect was tearful and her mood was depressed. Tr. at 443. She reported phobias, ideas of hopelessness and worthlessness, and visual hallucinations. *Id.* She had poor recent memory, but was able to concentrate and perform simple math and had an average fund of knowledge. Tr. at 444. Ms. McGregor noted that Plaintiff was actively using cannabis daily and benzodiazepines at least a couple of times per week and was resistant to acknowledge any connection between substance use and mood symptoms. *Id.* She recommended that Plaintiff resume mental health services and be referred for drug and alcohol treatment and indicated substance abuse was "most likely contributing to" Plaintiff's "current presentation symptoms." *Id.*

Plaintiff presented to psychiatrist Laura Lowenbergh, M.D. ("Dr. Lowenbergh"), on November 13, 2013. Tr. at 448–50. She reported headaches, poor sleep, difficulty focusing or concentrating, depressive thoughts and feelings of worthlessness. Tr. at 448. Dr. Lowenbergh assessed Plaintiff's judgment as fair and her insight as poor. Tr. at 449.

She indicated Plaintiff had intrusive and suicidal thoughts. *Id.* Dr. Lowenbergh suggested Plaintiff see her counselor more often, but Plaintiff was unwilling to commit to more frequent counseling sessions. Tr. at 449–50.

Plaintiff followed up with Dr. Lowenbergh on January 21, 2014, and reported improved mood on her current medication regimen. Tr. at 454. Dr. Lowenbergh noted that Plaintiff complained of mood swings and was presently hypomanic. Tr. at 456.

On May 15, 2014, Plaintiff reported worsened depression and fear of leaving her home. Tr. at 458. Dr. Lowenbergh indicated Plaintiff had been without medications for two weeks in April and had decreased her dosage of Saphris because she complained that it made her shaky. *Id.* Plaintiff admitted to being irritable, and Dr. Lowenbergh also observed that she was depressed and fearful. *Id.* Dr. Lowenbergh indicated Plaintiff was having suicidal thoughts, but had no intent or plan to commit suicide. Tr. at 459. She prescribed a three-week course of Viibryd to treat Plaintiff's depression. Tr. at 460.

Plaintiff followed up with nurse Dawn Eppes ("Ms. Eppes") at Greer Mental Health on May 2, 2014. Tr. at 461–62. She reported anxiety, depression, and sleep disturbance. Tr. at 461. She demonstrated no unusual psychiatric symptoms during the examination. Tr. at 462. Ms. Eppes noted that Plaintiff's blood pressure and pulse were elevated, and she directed Plaintiff to report to the emergency room. *Id.*

On July 24, 2014, Plaintiff requested that Dr. Lowenbergh prescribe something to help her to be able to get up and out of her house. Tr. at 465. She reported poor sleep and appetite. *Id.* Dr. Lowenbergh observed Plaintiff to demonstrate aggressive thoughts, obsessions, and auditory hallucinations. Tr. at 466. She noted Plaintiff's mood was angry,

9

irritable, and anxious. *Id.* Plaintiff had mildly impaired recent and remote memory, attention, and concentration. *Id.*

On August 12, 2014, Plaintiff reported to Dr. Lowenbergh that she felt better after taking an increased dose of Gabapentin. Tr. at 463. She continued to report depression and stated she had trouble breathing adequately. *Id.* She complained of poor sleep and appetite and little energy. *Id.* She was tearful and cried easily. *Id.* Her recent and remote memories were mildly impaired. Tr. at 463–64.

Plaintiff participated in literacy testing on October 22, 2014. Tr. at 468–69. Program manager Leah Clark ("Ms. Clark") indicated that she administered the Test of Adult Basic Education in reading to Plaintiff. Tr. at 468. She assessed Plaintiff's scores as being consistent with the expected reading level of students in the eighth month of sixth grade. *Id.* She indicated Plaintiff could interpret graphics and recall information from passages, but that her comprehension skills were somewhat lacking in words in context and understanding overall meaning. *Id.* Ms. Clark provided that Plaintiff was not functionally illiterate, because Plaintiff read above a fifth grade level and the classification was based upon reading below a fifth grade level. *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

i.      December 11, 2013

At the hearing on December 11, 2013, Plaintiff testified she was 54 years old. Tr. at 36. She indicated she last worked on December 3, 2010. *Id.* She denied having

received unemployment or workers' compensation benefits. Tr. at 37. She indicated she had stopped working because of an upper respiratory infection and heel spurs that prevented her from standing to work. *Id.*

Plaintiff testified she was unable to work because her knee pain prevented her from standing and walking. Tr. at 39. She indicated she wrapped her knees in ice for 20 minutes at a time and applied Biofreeze. *Id.* She stated she also propped her knees and avoided standing. Tr. at 41. She indicated she did not take any medications or receive medical care for her any orthopedic problems because she was unable to afford treatment. Tr. at 39.

Plaintiff testified she was 5'3" tall and weighed between 200 and 210 pounds. Tr. at 40. She indicated the medications she took for bipolar disorder caused her to gain weight. *Id.* She stated that being overweight resulted in increased strain on her knees and hips. Tr. at 40–41.

Plaintiff testified she could stand to wash dishes for approximately 15 minutes at a time. Tr. at 41. She indicated she would need to sit for 10 to 15 minutes after standing for 15 minutes. *Id.* She denied she would be able to complete an eight-hour shift that required she sit for half the time and stand for half the time. *Id.* She later indicated she could stand for three-and-a-half to four hours on a good day, but would be unable to stand for that length of time on successive days. Tr. at 42. She stated she could lift "maybe five pounds if that." Tr. at 44.

Plaintiff testified she continued to experience shortness of breath as a result of her history of cancer of the larynx. Tr. at 42. She indicated she had smoked in the past, but

had stopped smoking in 2006. Tr. at 43. She stated she had a nebulizer, but only used it once every three months. Tr. at 60.

Plaintiff testified she was diagnosed with bipolar disorder and PTSD when she was admitted to Marshall Pickens in November 2011. Tr. at 45. She indicated she continued to experience mood cycling. *Id.* She stated she cried often, had difficulty concentrating and focusing, and saw and heard things that were not there. *Id.* She endorsed symptoms of anxiety and indicated her anxiety was exacerbated by leaving her house. Tr. at 47. Plaintiff stated she only left her home to visit her doctors. Tr. at 48. She indicated she would have difficulty interacting with the public, arriving for work on time, and completing a 40-hour work week. *Id.* She stated she experienced periods of mania and that she often treated others poorly during those periods. Tr. at 49–50.

Plaintiff indicated she had started using marijuana when she had cancer and that it reduced her nausea. Tr. at 46. She denied daily marijuana use and stated she continued to smoke marijuana approximately once a month. *Id.* Plaintiff admitted that she had once sold her husband's Xanax to obtain money to buy groceries. Tr. at 51. She indicated she had last abused Xanax three months earlier. Tr. at 55. She denied having obtained Xanax from friends, but admitted she had taken her husband's Xanax. *Id.*

Plaintiff testified she watched television for the majority of most days. Tr. at 51. She indicated she was not responsible for babysitting her grandchildren. Tr. at 52. She stated her son visited daily and a friend visited at least once a week. *Id.* She indicated she had stopped driving in 2010 and had been fearful of leaving her house since that time. *Id.* She stated she and her husband split the household duties, but that her husband ran

errands and shopped for groceries. Tr. at 52–53. She testified she cooked; washed dishes; did laundry; folded clothes; dusted; cleaned her bathroom, living room, and kitchen; sewed; and played games and watched movies with her grandchildren. Tr. at 56–60. She stated she did not iron, sweep, mop, vacuum, take out the trash, perform household maintenance, work in her yard or garden, cut grass, hunt, fish, drive, travel outside the state, attend religious services, visit stores, go out to restaurants or movies, or visit parks, beaches, or lakes after October 2011. Tr. at 57–60. She indicated she grew tropical plants as a hobby. Tr. at 53. She denied having an internet connection in her home. *Id.*

Plaintiff denied having had knee surgery, magnetic imaging of her knees, or having been prescribed medication for her knee pain. Tr. at 54. She indicated she had not visited the emergency room for breathing difficulty over the prior 12-month period. Tr. at 55.

ii.    October 14, 2014

At the hearing on October 14, 2014, Plaintiff testified she last worked at the Dollar General store on December 3, 2010. Tr. at 73. She indicated that the greatest limitation to her ability to work was that she became tired quickly. *Id.* She stated it was difficult for her to walk because her knees gave out. *Id.* She indicated her knee pain had worsened since her last hearing. Tr. at 80–81.

Plaintiff testified she was 5' 3" tall and weighed 268 pounds. Tr. at 74. She indicated she had gained 30 pounds over the prior two-year period because of her medications. *Id.* She stated her weight contributed to her limitations. Tr. at 76.

Plaintiff testified she took Aleve and Advil and used ice and heat to treat her knee pain. Tr. at 75. She indicated she had been unable to afford treatment. *Id.* The ALJ asked Plaintiff if she received free treatment at the mental health clinic. *Id.* Plaintiff responded that the mental health clinic allowed her to pay an amount that she could afford. *Id.* The ALJ asked Plaintiff if she had attempted to obtain medical treatment from a free clinic. *Id.* Plaintiff responded that she had visited a clinic in 2010 for treatment of heel spurs, but that she had not returned to the clinic because she did not feel comfortable being around the other patients. Tr. at 75–76. The ALJ asked Plaintiff why she was able to tolerate the other patients at the mental health clinic, but could not tolerate the other patients at the free medical clinic. Tr. at 76. Plaintiff indicated there were fewer people in the mental health clinic. *Id.*

Plaintiff testified that she would have difficulty working around people. Tr. at 77–78. She stated she would experience anxiety because she would be unable to perform a job correctly. Tr. at 78. She stated she visited the mental health clinic twice a month, but denied having been hospitalized for psychiatric problems. Tr. at 82.

Plaintiff testified that it was difficult for her to walk from the parking lot to the hearing facility and that she could walk for about a block. Tr. at 73. She stated she had fallen twice in the last week. *Id.* Plaintiff indicated she was unable to squat, crawl, or bend. Tr. at 78. She testified she was unable to lift 20 pounds without pain. Tr. at 79. She indicated she could stand for no more than one to two hours during an eight-hour day. *Id.* She stated she had difficulty breathing during panic or anxiety attacks and when she walked for too long. Tr. at 85.

14

Plaintiff testified she had last smoked cigarettes on September 25, 2005. Tr. at 74. She stated she last used marijuana on September 13, 2013. *Id.* She indicated she had sold her husband's Xanax to buy groceries prior to September 2013. Tr. at 84. She stated she last used alcohol in December 2011. *Id.*

Plaintiff testified she saw one of her grandchildren every other day and saw the other three grandchildren once or twice per month. Tr. at 86. She indicated she rolled a ball to her one-year-old grandson. *Id.* She stated she sat and pitched a ball and played board games with her other grandchildren. *Id.* She denied attending her grandchildren's school activities. *Id.*

Plaintiff testified her husband had to take over the care of her tropical plants because she was no longer able to go outside to water and care for them each day. Tr. at 88. She stated that she did word searches as a hobby and that they helped her to concentrate. *Id.*

b.    Vocational Expert Testimony

i.    December 11, 2013

Vocational Expert ("VE") Jeanette Clifford reviewed the record and testified at the hearing. Tr. at 61–64. The VE categorized Plaintiff's PRW as an assistant manager in retail. Tr. at 62. She explained that the job of assistant manager was not specifically classified in the *Dictionary of Occupational Titles* ("*DOT*"), but that the job of retail manager, *DOT* number 185.167-046, was light in exertion with a specific vocational preparation ("SVP") of seven. *Id.* She explained that the job of assistant manager would be at least semi-skilled with an SVP of four. *Id.* The ALJ described a hypothetical

individual of Plaintiff's vocational profile who could occasionally lift 50 pounds and frequently lift 25 pounds; could stand for six out of eight hours; could walk for six out of eight hours; could sit for six out of eight hours; could never use ladders, ropes, or scaffolds; could occasionally kneel, crouch, and crawl; could frequently climb, balance, and stoop; should avoid concentrated exposure to fumes and hazards; could occasionally have contact with the public; and was limited to simple, routine, repetitive tasks, defined as simple one- and two-step tasks. Tr. at 62–63. The VE testified that the hypothetical individual would be unable to perform any of Plaintiff's PRW. Tr. at 63. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs at the medium exertional level with an SVP of two as a packer, *DOT* number 920.687-134, with 1,064 positions in South Carolina and 99,916 positions in the national economy and a linen room attendant, *DOT* number 222.387-030, with 1,971 positions in South Carolina and 160,295 positions in the national economy. *Id.* She indicated the hypothetical individual could also perform a job at the medium exertional level with an SVP of one as a dryer attendant, *DOT* number 581.686-018, with 1,042 positions in South Carolina and 142,284 positions in the national economy. *Id.* The ALJ next asked the VE to assume the same limitations in the first hypothetical, but to further assume that the individual would have daily interruptions from attending the work station and that the interruptions would occur at the individual's discretion. Tr. at 63–64. The VE testified that an employer would not tolerate the individual taking unscheduled breaks that prevented her from meeting critical job demands. Tr. at 64.

Plaintiff's attorney asked the VE to assume the hypothetical individual would be unable to complete a 40-hour work week. *Id.* The VE indicated the individual would be unable to sustain competitive work. *Id.*

## ii.    October 14, 2014

VE Chris Weldon reviewed the record and testified at the hearing. Tr. at 92. The ALJ indicated that Plaintiff had no PRW because her wages did not reflect substantial gainful activity. *Id.* He described a hypothetical individual of Plaintiff's vocational profile who could occasionally lift 50 pounds and frequently lift 25 pounds; could stand for six out of eight hours; could sit for six out of eight hours; could not use ladders, ropes, or scaffolds; could occasionally kneel, crouch, and crawl; could frequently climb, balance, and stoop; should avoid concentrated exposure to fumes and hazards; and could perform simple one- and two-step tasks that did not involve contact with the public. Tr. at 92–93. The ALJ asked if the hypothetical individual could perform any jobs at the medium exertional level. Tr. at 93. The VE testified that the individual could perform medium jobs with an SVP of two as a kitchen helper, *DOT* number 318.687-010, with 1,000 positions in the upstate of South Carolina and 509,000 positions nationally; a cleaner, *DOT* number 919.687-014, with 2,700 positions in the upstate of South Carolina and 336,000 positions nationally; and a hand packer, *DOT* number 920.587-018, with 2,100 positions in the upstate of South Carolina and 698,000 positions nationally. *Id.*

Plaintiff's attorney asked the VE to assume the same restrictions set forth in the ALJ's hypothetical question, but to further assume the individual was limited to only occasional climbing, balancing, and stooping. Tr. at 94. He asked if the individual would

be able to perform any jobs. *Id.* The VE testified that the individual would be unable to perform work. *Id.* Plaintiff's attorney asked the VE to assume the individual could frequently climb, balance, and stoop, but could only stand and walk for four out of eight hours. *Id.* He asked if the individual could perform medium work. *Id.* The VE testified the individual could perform no medium work. *Id.*

### 2.    The ALJ's Findings

In his decision dated February 2, 2015, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2015.
2.    The claimant has not engaged in substantial gainful activity since April 14, 2014, her amended alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe combination of impairments: knee chondromalacia, a bipolar disorder, a post-traumatic stress disorder and obesity (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, to sit, stand and/or walk for about 6 hours in an regular 8 hour workday, to climb, balance and stoop frequently, to kneel, crouch and crawl only occasionally, with no ability to climb ladders, ropes or scaffolds, with a need to avoid concentrated exposure to fumes and gases and to also avoid concentrated exposure to hazards, and with the claimant capable of only simple, one and two step tasks with no contact with the public.
6.    The claimant has no past relevant work in this case.
7.    The claimant was born on April 29, 1959 and was 55 years old, which is defined as an individual of advanced age, on her amended alleged disability onset date (20 CFR 404.1563).
8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 29, 2014 through the date of this decision (20 CFR 404.1520(g)).

Tr. at 13–26.

## II.    Discussion

Plaintiff alleges the Commissioner erred because substantial evidence does not support the ALJ's finding that she had a high school education. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

The record contains the following evidence regarding Plaintiff's educational attainment:

The December 17, 2011, initial clinical assessment from Greer Mental Health includes the following:

> 10. Describe educational background (how far in school, tech school, college, special ed., special programs, highest level completed).

Graduated 12th grade.

Tr. at 400. On January 8, 2013, Dr. Korn indicated in the social history portion of his evaluation report that Plaintiff was a high school graduate. Tr. at 419. On January 16, 2013, Dr. Kofoed indicated Plaintiff graduated from Greenville High School in 1977. Tr. at 424. On May 21, 2013, Dr. Price wrote "Ms. Jones said she went to the 12th grade and never got a GED. She did not repeat any grades. She quit school to get married." Tr. at 437. The July 8, 2013, initial clinical assessment from Greer Mental Health includes the following:

> 10. Describe educational background (how far in school, tech school, college, special ed., special programs, highest level completed).

> 12th grade

Tr. at 442. During the hearing on December 11, 2013, Plaintiff's attorney argued that Medical-Vocational Rule 201.14, which pertains to individuals with a high school education or more, rendered Plaintiff disabled. Tr. at 35. The following exchange took place during Plaintiff's testimony:

> ALJ:        How far did you go in school?

> Plaintiff:    I went to the twelfth grade, sir.

Tr. at 36. At the hearing on October 14, 2014, the following relevant testimony was offered:

> ALJ:        You completed the twelfth grade, is that correct?

> Plaintiff:    Yes, sir.

Tr. at 72. Plaintiff's attorney stated Plaintiff had a high school diploma. Tr. at 95. However, Plaintiff subsequently submitted a signed statement indicating that she entered the twelfth grade, but did not complete high school. Tr. at 328.

Plaintiff argues the ALJ erred in determining that she had a high school education. [ECF No. 10 at 7]. Although Plaintiff acknowledges that the record contains conflicting evidence regarding the highest level of education she attained, she maintains that the evidence overwhelmingly supports the conclusion that she had less than a high school education. *Id.* at 7–9. She further contends that, even if the ALJ's conclusion that she had a high school diploma were supported, his conclusion that she had a high school education was inconsistent with her measured abilities. *Id.* at 9–10. She argues that if the ALJ had adequately assessed her education level as limited or marginal, Grid Rule 203.10[4] and SSR 82-63 would have directed a finding that she was disabled. *Id.* at 13; [ECF No. 12 at 6].

The Commissioner argues that Plaintiff's contention that she did not graduate from high school lacks credibility in light of her repeated statements to the contrary. [ECF No. 11 at 6]. She maintains that Plaintiff has failed to show how her alleged marginal education affects her ability to perform the jobs identified by the VE. *Id.* at 8. She argues that Medical-Vocational Rule 203.10 does not direct a finding that Plaintiff is disabled, even if Plaintiff lacks a high school education because Plaintiff cannot prove that her education was "limited or less." *Id.* at 9–10. She maintains that either Grid Rule

---

[4] Plaintiff initially argued a finding of disability was supported by Grid Rule 203.02, but clarified in her reply brief that the applicable rule would be 203.10. [ECF No. 12 at 6].

203.11 or 203.12 would be more appropriate to apply because Plaintiff had "previous work experience," which differs from PRW. *Id.* at 10. She contends that neither of these Grid Rules direct a finding that Plaintiff is disabled. *Id.* at 10–11.

Medical-Vocational Rule 203.10 directs a finding that an individual is disabled if she has a maximum RFC for medium work, is of advanced age, has a limited or less education, and has no previous work experience. 20 C.F.R. Pt. 404, Subpt. P, App'x. 2, § 203.10. "[T]he absence of any relevant work experience becomes a more significant adversity for persons of advanced age (55 and over)." 20 C.F.R. Pt. 404, Subpt. P, App'x. 2, § 203.00(c). "Accordingly, this factor, in combination with a limited education or less, militates against making a vocational adjustment to even this substantial range of work and a finding of disabled is appropriate." *Id.* "In the cases involving individuals of advanced age, the only medical issue is the existence of a severe medically determinable impairment." SSR 82-63, 1982 WL 31390, at *5 (Jan. 1, 1982). The Ruling further provides the following:

> The only vocational issues are advanced age, limited education or less, and absence of relevant work experience. With affirmative findings of fact, the conclusion would generally follow that the claimant or beneficiary is under a disability. If all the criteria of this medical-vocational profile are not met, the case must be decided on the basis of the principles and definitions in the regulations, giving consideration to the rules for specific case situations in Appendix 2.

*Id.*

In examining education as a vocational factor, "education" primarily means formal schooling and the numerical grade level completed is generally considered to be the best measure of an individual's actual educational abilities, unless there is other evidence to

contradict it. 20 C.F.R. § 404.1564(b). A limited education "means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. § 404.1564(b)(3). The regulation further provides that formal education from the seventh through eleventh grade is generally considered to be a limited education. *Id.* "High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above." 20 C.F.R. § 404.1564(b)(4).

The ALJ determined Plaintiff to be an individual of advanced age. Tr. at 25. He found that she had at least a high school education and was able to communicate in English. *Id.* He determined transferability of job skills was not an issue because Plaintiff had no PRW. *Id.* After considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.*

Contrary to Plaintiff's assertion, the evidence does not overwhelmingly show that she did not complete high school. Instead, it presents a question of fact as to the highest level of education that she attained. *Compare* Tr. at 35 (Plaintiff's attorney indicated she was a high school graduate to support his argument that Medical-Vocational Rule 201.14 directed a finding that she was disabled), 72 (Plaintiff testified that she completed the twelfth grade), 95 (Plaintiff's attorney stated she had a high school diploma), 400 (Greer Mental Health Center assessment indicates "[g]raduated 12th grade"), 419 (Dr. Korn indicated Plaintiff was a high school graduate), 424 (Dr. Kofoed indicated Plaintiff

26

graduated from Greenville High School in 1977), *with* Tr. at 36 (Plaintiff testified she "went to the twelfth grade"), Tr. at 328 (Plaintiff submitted a signed statement indicating she entered the twelfth grade, but did not complete high school), 437 (Dr. Price indicated Plaintiff said she went to the 12th grade, but dropped out to get married and never obtained a GED"). As the finder of fact, the ALJ was in the best position to resolve this conflict in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."). The ALJ concluded that Plaintiff had a high school education and cited her attorney's indication that she had a high school diploma. Tr. at 25. He then went on to discuss the literacy testing and to explain that the literacy test results did not conflict with a finding that Plaintiff was a high school graduate. *See id.* The ALJ's explanation reveals that he was aware of a conflict in the evidence regarding Plaintiff's educational abilities. *See id.* However, his explanation neglects to recognize the conflicting evidence as to whether Plaintiff actually completed high school. The ALJ failed to acknowledge Plaintiff's October 2014 signed statement indicating that she did not complete high school and the other evidence that suggested she went to, but did not complete the twelfth grade. *See* Tr. 36, 328, 427. Had the ALJ's decision reflected that he weighed the conflicting evidence to conclude that Plaintiff completed high school, the undersigned would be inclined to find that substantial evidence supported his decision. However, because the ALJ did not even allude to the evidence that suggested Plaintiff did not complete high school, the undersigned cannot find that he fulfilled his obligation to

27

resolve conflicts in the record or that his conclusion was supported by substantial evidence.

Despite the undersigned's recommendation that the court find that substantial evidence did not support the ALJ's conclusion that Plaintiff was a high school graduate, the undersigned declines to find that the literacy testing proves Plaintiff lacked a high school education. The undersigned's research reveals no binding decisions on point. However, in a number of non-binding cases, the courts have unanimously concluded that substantial evidence supported ALJs' decisions to rely on the grade completed as a vocational factor, despite evidence that suggested that the grade completed was not commensurate with the individuals' abilities. In *Perez v. Barnhart*, 415 F.3d 457, 462–63 (5th Cir. 2005), the plaintiff challenged the ALJ's finding that he had a high school education. The plaintiff presented evidence that he was enrolled in special education courses through the tenth grade, received course credit for work as a painter during his eleventh and twelfth grade years, and had such difficulty spelling that he could not complete a job application. *Perez*, 415 F.3d at 462. The Fifth Circuit Court of Appeals held that, despite this evidence, the ALJ properly relied upon the plaintiff's testimony and his school records to support a finding that he had a high school education. *Id.* at 463. The Fifth Circuit similarly found that substantial evidence supported the ALJ's determination that the plaintiff had a high school education in *Arce v. Barnhart*, 185 F. App'x. 437, 440 (5th Cir. 2006), where the plaintiff's testimony and school records showed that she had a high school education, but was enrolled in special education courses and functioned academically between the third and sixth grade-levels. *Id.*

28

In *Lipson v. Barnhart*, 347 F.Supp.2d 1182, 1187 (M.D.Ala. 2004), the court rejected the plaintiff's argument that the ALJ improperly determined that she had a tenth grade education. Although the plaintiff presented evidence that included proof of enrollment in special education classes and test scores that showed her to be reading at less than a third grade level, the court held that the ALJ's determination was supported by substantial evidence in the form of the plaintiff's testimony that she completed the tenth grade. *Lipson*, 347 F.Supp.2d at 1186–87; *see also McCune v. Astrue*, No. 5:12-3884-RDP, 2014 WL 1022487 (N.D.Ala. Mar. 14, 2014) (finding that where the plaintiff testified he had graduated from high school, the ALJ did not err in concluding that he had a high school education, despite evidence that he attended special education classes and had difficulty reading and writing). The court in *Lipson* explained its finding as follows:

> Although Lipson may not read at the tenth grade level, that does not mean she did not receive a tenth grade education and/or attend classes with tenth graders. Furthermore, her level of reading ability, as arguably disclosed by the test performed by Dr. Kirkland, does not reflect her ability to reason or to work or to supervise. Nor does it reflect her social skills, her ability to follow or give verbal instructions, or to perform a myriad of manual tasks which require no reading.

> If Lipson had, hypothetically, attained only a third-grade education, rather than a third-grade reading level, the court's analysis and the outcome of this case might be different. However, it is undisputed that Lipson remained in school until she completed the tenth grade, and her employment history indicates that, quite apart from her ability or inability to read, she has successfully held positions which required her to perform intelligence-based tasks such as maintaining security logs, operating cash registers, counting money, and/or reading menus and taking and writing down orders.

> Regrettably, society offers many examples of high school drop-outs who do not read at their grade level, but who are nevertheless capable of performing jobs which require intellectual functioning. These persons are not eligible for social security benefits merely because they have substantial

29

reading deficiencies. They may be "less able," but they are not automatically deemed "disabled."

*Id.*

Here, the ALJ cited substantial evidence to support his conclusion to rely on the level of education completed by Plaintiff, as opposed to the measure of her reading ability. The ALJ explained his consideration of the literacy testing as follows:

> Subsequent to the most recent hearing, Ms. Jones was evaluated by Leah Clark of the Greenville (South Carolina) Literacy Association. This occurred on October 22, 2014. In this testing, the claimant was reading at the sixth grade, eighth month level. Ms. Clark indicated that Ms. Jones was clearly literate. Ms. Clark went on to say that Ms. Jones could recall information from passages she had read. Ms. Clark also observed that the claimant could interpret graphics in the testing (Exhibit B15F). At the hearing, the claimant's attorney admitted that she has a high school diploma. Nothing in the claimant's literacy testing negates that fact. There has been no evidence presented that the claimant was in special education classes or was not exposed to a regular 12 grade curriculum. Thus, Ms. Jones indeed has a high school education.
>
> I parenthetically note that, at her October 2014 hearing, Ms. Jones stated that she enjoyed doing word puzzle books, where one searches for words among blocks of letters. While not directly on point as to whether she is a high school graduate, this activity shows significant reading and word recognition ability.

Tr. at 25. Thus, the ALJ specifically considered the literacy testing, but found that it did not support a finding that Plaintiff had a lesser level of education than she completed. The ALJ cited Plaintiff's level of educational attainment, the fact that she was exposed to a regular 12 grade curriculum, a lack of special education, and Plaintiff's completion of word puzzle books to refute the suggestion that Plaintiff functioned below a high school level. As pointed out in *Lipson*, an individual's reading ability is but one aspect of her level of educational attainment and, here, the ALJ indicated that other measures showed

Plaintiff to have attained a higher level of education than that reflected in her literacy assessment. In light of the ALJ's sufficient explanation for his conclusion and in view of the non-binding cases on point, the undersigned recommends the court find that the ALJ did not err in finding that the literacy assessment did not direct a finding that Plaintiff had a limited education.

The Commissioner argues remand is not warranted because Plaintiff had previous work experience, which differs from PRW and precludes a finding that she is disabled under the Medical-Vocational Rules. *See* [ECF No. 11 at 10–11]. The Commissioner's argument is undermined by the ALJ's own finding that Plaintiff had no previous work experience. *See* Tr. at 25 ("If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.14.[5]"). By indicating that Medical-Vocational Rules 203.14 would be applicable if Plaintiff could perform a full range of medium work instead of a reduced range of medium work, the ALJ acknowledged that Plaintiff had no previous work experience. In light of the ALJ's finding, the undersigned cannot accept the Commissioner's post hoc argument to the contrary. *See Hall v. Colvin*, C/A No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, C/A No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. March 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral

---

[5] If an individual has a maximum RFC for medium work, is of advanced age, is a high school graduate, and has no previous work experience, Medical-Vocational Rule 203.14 directs a finding that she is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App'x. 2, § 203.14.

principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

In light of the foregoing, the undersigned recommends the court find the ALJ failed to support his conclusion that Plaintiff was a high school graduate with substantial evidence. The undersigned notes that the record contains conflicting evidence regarding Plaintiff's highest level of educational attainment and that this evidence was not adequately weighed by the fact finder. Because a finding that Plaintiff had less than a high school education would have directed a decision that she was disabled under Medical-Vocational Rule 203.10, it is necessary that the case be remanded for reevaluation of the conflicting evidence and a determination as to whether Plaintiff had a high school education.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

December 17, 2015                          Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).